JACKSON LEWIS LLP
59 Maiden Lane
New York, New York 10038
(212) 545-4000
    Clifford R. Atlas (CRA 9512)
    Marjorie Kaye, Jr. (MK 7141)
Attorneys for Defendant

### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| GLEN M. CLAYBORNE,<br><br>    Plaintiff,<br><br>-against-<br><br>OCÉ BUSINESS SERVICES,<br><br>    Defendant. | Case No.: 05-cv-7909 (KMW)(HBP)<br><br>**DEFENDANT'S RULE 56**<br>**STATEMENT OF UNCONTESTED**<br>**FACTS** |

       Defendant Océ Business Services (hereinafter "OBS" or "Defendant") submits this Statement of Uncontested Facts pursuant to Local Rule 56 of the United States District Court for the Southern District of New York in support of its Motion for Summary Judgment.

### STATEMENT OF FACTS

       1. Plaintiff was employed by Océ Business Services, formerly known as Archer Management Services.

       2. The primary business of OBS is the outsourcing of document services (Guerriere Aff., ¶ 2.)

       3. During his employment, Plaintiff held various positions at client locations throughout New York City. (Pl. Dep. pp. 31-32.)

4. In September 2002, Plaintiff was assigned to the "floating manager pool." (Pl. Dep., Ex. 23.)

5. As a floating manager, Plaintiff was not assigned to a particular location. (Pl. Dep. pp. 31-32.)

6. As a floating manager, Plaintiff was assigned to cover for managers who were absent from work due to illness, vacations, or other approved leave. (Pl. Dep., pp. 29-30).

7. Plaintiff's job duties as a floating manager included answering phones, making copies, monitoring the mail sweep and overseeing the overall operation at the location. (Pl. Dep. p. 31.)

8. Because the need for a floating manager to cover at a particular location cannot always be reasonably anticipated, it is important that a floating manager have the ability to fill in at any and all of Defendant's locations. (Guerriere Aff., ¶ 3.)

9. In or around August 2003, Plaintiff had an opportunity to leave the floating manager pool and interview for a permanent position for a client located at One Liberty Plaza in lower Manhattan. (Pl. Dep. pp. 152-56; Guerriere Aff. ¶ 5.)

10. Plaintiff refused to be considered for the position because he felt uncomfortable working across the street from Ground Zero. (Pl. Dep pp. 155-56; Guerriere Aff. ¶ 5.)

11. At least seven (7) of Defendant's clients asked that Plaintiff not be assigned to their locations. (Guerriere Aff. ¶ 4.)

12. A client, Time, Inc., asked that Plaintiff not be assigned to its location following a confrontation between Plaintiff and the Site Manger over his refusal to punch a timecard. (Pl. Dep. pp. 123, 132; Guerriere Aff. ¶ 4.)

13. A client, Black Rock, asked that Plaintiff not return to its location after he refused to perform a mail run and to work the assigned schedule. (Pl. Dep. pp. 125-26; Guerriere Aff. ¶ 4.)

14. A client, Forbes Magazine, asked that Plaintiff not be assigned to its location because he refused to work after five o'clock p.m. (Pl. Dep. pp. 127-28; Guerriere Aff. ¶ 4.)

15. A client, Bloomberg Company, asked that Plaintiff not return to its location because he refused to perform the assigned duties. (Pl. Dep. pp. 128-29; Guerriere Aff. ¶ 4.)

16. A client, Giorgio Armani, declined to have Plaintiff return to its location due to issues with his attitude, attendance, and tardiness. (Guerriere Aff. ¶ 4.)

17. A client, New York College Podiatric Medicine, requested that Plaintiff not be assigned to its location after discovering that he spent excessive time on non-work-related internet sites. (Guerriere Aff. ¶ 4.)

18. A client, Bank of America, refused to allow Plaintiff to return to its location after receiving reports from staff that they felt threatened by him. (Pl. Dep. pp. 136-37; Guerriere Aff. ¶ 4.)

19. Plaintiff's written performance reviews consistently reflected the need for him to improve his problem solving, organization and communication skills. In particular, in

Plaintiff's 2000 – 2001 performance review, he received a rating of "Needs Improvement" with respect to his problem solving and organization skills. (Kaye Aff., Exhibit 4.)

20. In Plaintiff's 2001 – 2002 performance review, he received a rating of "Needs Improvement" for his communication skills. (Kaye Aff., Exhibit 5.) In that review, Plaintiff admitted that his communication skills needed improvement.

21. In Plaintiff's 2003 – 2004 performance review, he received a rating of "Does Not Meet Expectations" with respect to his communication skills. (Kaye Aff., Exhibit 6.) Additionally, the reviewer, Brian Guerriere, noted that "Glen has had problems at Time, Inc. and a few of our other clients. He must work better with our clients to ensure acceptance while covering for other managers."

22. In August 2004, due in large part to the loss of a major national client, OBS was forced to reduce the number of managers in the Tri-State region's floating manager pool. (Guerriere Aff. ¶ 6.)

23. To decide which managers would be subject to the reduction, Operations Manager Brian Guerriere examined a number of factors, including length of service, salary, job performance, and the ability to work with all of OBS' clients in the geographical area. (Guerriere Aff. ¶ 7.)

24. Plaintiff was one of the lowest-ranked managers and was selected for layoff on that basis. (Guerriere Aff. ¶¶ 7, 9.)

25. Plaintiff ranked particularly low with respect to the last criterion -- the ability to work with all of OBS' clients in the geographical area. (Guerriere Aff. ¶ 7.)

4

26. Based on the aforementioned factors, Plaintiff was one of the six (6) managers selected for layoff. (Guerriere Aff. ¶ 8.)

27. Of the managers from the floating pool selected for layoff, six (6), two (2) were Caucasian, one (1) was Asian/American Indian decent, and three (3) were African American. (Guerriere Aff. ¶ 8.)

28. Of the managers from the floating pool who were retained, two (2) were African American and one was (1) Hispanic. (Guerriere Aff. ¶ 8.)

29. Plaintiff's layoff was effective September 13, 2004. (Pl. Dep. p. 10)

30. On January 3, 2005, Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission. (Kaye Aff., Exhibit 7.)

31. Plaintiff claims he was told in 1998 by Robert Zambardi that if he did not wear a white shirt to work, he would not get a raise (Pl. Dep. Pp. 73-74).

32. Plaintiff asserts that Area Manager Alan Schleeper told him that the site administrator at a site where Plaintiff was to interview for a position preferred Mr. Schleeper's kind (White) and did not like Plaintiff's kind (Black). (Pl. Dep. pp. 74-75.) Plaintiff admits this statement was made sometime between April and June 2002. (Pl. Dep. p. 98.)

33. Plaintiff claims that he complained to Amy Purvis in Defendant's Human Resources department about this statement. (Pl. Dep. p. 75.) However, Brian Guerriere was not aware of the alleged statement or complaint. (Guerriere Aff. ¶ 10.)

34. Plaintiff also alleges that a similar remark was made by Area Manager Derek Ruston in "early 2003." (Pl. Dep. p. 102.)

35. Plaintiff claims in 2003, Area Manager Don Adams said that "you would have to be crazy [to have Plaintiff work for you]" (Pl. Dep. pp. 103-104, 137-39).

36. Plaintiff claims he was forced to punch a timecard, in 2003 (Pl. Dep. pp. 130-133);

37. Plaintiff claims he was given unfavorable job assignments such as throwing out furniture and boxes in 2003 (Pl. Dep. pp. 116-17).

38. Plaintiff claims he was accused of stealing a co-worker's scarf in 2003 (Pl. Dep. pp. 120-123).

39. Plaintiff claims that in December 2003, he was confronted by Operations Manager Chris Hyland and accused of stealing a scarf belonging to an African-American co-worker. (Pl. Dep. p. 120, 122.) Although Plaintiff denied stealing the scarf, he never offered an explanation for why it was in his possession. (Pl. Dep. pp. 121-23.) Nonetheless, Plaintiff was not disciplined in any way for the incident. (Pl. Dep. p. 123; Guerriere Aff. ¶ 11.)

40. Plaintiff believes that the black co-worker who made the allegation of theft was "a little mad because I guess she was next in line to get my position I came there for." (Pl. Dep. p. 122.)

41. Chris Hyland was not a decision maker with respect to Plaintiff's selection for layoff. (Guerriere Aff. ¶ 6.)

6

42. Plaintiff claims he was denied an office in 2003. (Pl. Dep. pp. 118)

43. Plaintiff claims he was asked to perform a mail run in 2003 (Pl. Dep. p. 125, 134).

44. Plaintiff claims he was orally reprimanded for being late to work in 2003 (Pl. Dep. p. 129, 133).

45. Plaintiff claims he was told that in 2003 none of the area managers wanted to work with him (Pl. Dep. pp. 145-52).

Respectfully submitted,

JACKSON LEWIS LLP
59 Maiden Lane
New York, New York 10038
(212) 545-4000

Dated: October 18, 2006
New York, New York

By: _____
Clifford R. Atlas (CRA 9512)
Marjorie Kaye, Jr. (MK 7141)

ATTORNEYS FOR DEFENDANT